## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

|  |  |
|---|---|
| JENNIFER COLLINS,<br><br>           Plaintiff<br><br>v.<br><br>KNOX COUNTY, SHERIFF DANIEL DAVEY, HELEN MYLEN, OFFICER REED and SHANNON HILKER,<br><br>           Defendants | Civil No. 07-73-B-S |

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Now before the Court are Defendants Knox County, Helen Mylen, Shannon Hilker and Officer Reed's Motion for Summary Judgment[1] (Docket # 27) and Defendant Daniel Davey's Motion for Summary Judgment (Docket # 30).  Plaintiff opposes both the Summary Judgment Motions.  (See Plaintiff's Opposition to Defendants Knox County et al. and Sheriff Daniel Davey's Motions for Summary Judgment (Docket # 35)).  After a thorough review of the parties' arguments, affidavits, depositions, and other exhibits submitted on the Motions, the Court concludes that there are no material issues of fact that prevent the entry of summary judgment

---

[1] Plaintiff's Complaint identifies the corrections officers as "Helen Mylan," and "Sharon Hiliker".  Defendants Summary Judgment Motion indicates that the corrections officers involved in this case are actually "Helen Mylen" and "Shannon Hilker".  Since these individuals were in employ of Knox County, the Court will credit Defendants' statement regarding the officers' identification and the correct spelling of their names.  With respect to Officer Reed, the record only identifies him as a male corrections officer and does not disclose his first name.  The Court will, therefore, refer to him simply as Officer Reed.

1

and, for the reasons stated below, the Court will grant Defendants' Motions for Summary Judgment.

## I. Summary Judgment Standard

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  Santoni, 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## II. Facts

On January 16, 2006, Plaintiff Jennifer Collins turned herself in to the Knox County Jail on an outstanding warrant for theft by deception, a Class C felony, and misuse of identification, a Class D misdemeanor.[2]  (Affidavit of Jennifer Collins ¶ 11; Collins Dep. at 11-12; Exhibit 1.)  Plaintiff was arrested at approximately 6:56 p.m.  (Defendants' Exhibits 1 and 4.)  Bail was set at $3,000 cash.  (Collins Dep., p. 62; Defendants' Exhibits 1 and 4.)  Plaintiff called her husband to see if he could come up with bail, but he informed her that he was not able to come up with $3,000 at that time of night.  (Collins Dep. at 23.)  Plaintiff then informed the officers at the jail that she could not make bail.  (Collins Dep. at 25.)  She was booked and placed into a small holding cell off the booking room until approximately 10:00 or 10:30 p.m. (Collins Aff. ¶ 16.)

At the Knox County Jail, if an arrestee is unable to make bail, the supervisor will look at the inmate files to ascertain whether the individual has previously been arrested and, if so, what the prior charge was.  (Affidavit of Kathy Carver ¶ 3; Affidavit of Marsha Clark ¶ 6; Affidavit of Helen Mylen ¶ 6.)  This information helps determine how the inmate will be classified and what type of search will be performed.  (Carver Aff. ¶ 4; Clark Aff. ¶ 7.)  Sergeant Marsha Clark, the supervisor on duty that night, remembered Plaintiff's name had previously been Jennifer Bowen, which lead her to search for a inmate file under the name Jennifer Bowen. (Clark Aff. ¶¶ 5-9.)  That inmate file indicated that on February 29, 2004, Plaintiff had been charged with unlawful possession of Schedule W drugs and operating after suspension. (Defendants' Exhibit 5; Clark Aff. ¶ 9; Collins Aff. ¶ 3.)  After being arrested, Plaintiff was

---

[2] Because of the dollar amount involved, the theft by deception charge was a felony.  (Plaintiff's Affidavit ¶ 14.) The theft by deception charge was later dropped to a misdemeanor.  (Plaintiff's Affidavit ¶ 15.)

transported to the Knox County Jail; however, she was not strip searched. (Collins Aff. ¶ 4.) Plaintiff's bail was set at $800.00. (Defendants' Exhibit 50.) Both charges were later dismissed.[3] (Collins Aff. ¶ 7; Collins Exhibit 2.)

Plaintiff brought nothing with her into the jail that evening except a few feminine hygiene items. (Collins Aff. ¶ 12.) Based on this prior charge and the fact that the Plaintiff was unable to make bail, Sgt. Clark told Officer Helen Mylen to conduct a strip search of Plaintiff. (Clark Aff. ¶ 11; Mylen Aff. ¶ 5.) Sometime shortly after 10:30 p.m., Plaintiff was told by Officer Mylen that she had to submit to a strip search. (Collins Aff. ¶ 23.) Thereafter, Officer Mylen conducted a strip search of Plaintiff. (Clark Aff. ¶¶ 11-12; Mylen Aff. ¶¶ 7-8; Collins Aff. ¶ 13; Defendants' Exhibit 1.) During the strip search, Ms. Collins was required to run her fingers through her hair; extend her arms out straight; open her mouth for visual inspection; spread her toes; lift each of her breasts; squat on her haunches with her back to the Corrections Officer; and while squatting, cough violently several times.[4] (Collins Aff. ¶ 25.) Plaintiff was also required to turn and face Officer Mylen and expose her vagina to the Officer. (Collins Aff. ¶ 27.) Officer Mylen indicated to Plaintiff: "This is standard procedure." (Collins Aff. ¶ 24.) During the strip search, Plaintiff saw a male guard walk over to the strip search area and hand Officer Mylen a new tampon for Plaintiff. (Collins Aff. ¶ 34.) As with all other strip search procedures at the Knox County Jail, this procedure took place in the changing area of a shower

---

[3] The charge for Unlawful Possession of Schedule W Drugs was dismissed because Plaintiff had a legal prescription for the medication. (Collins Aff. ¶ 8; Collins Exhibit 2.) The charge of Operating After Suspension was dismissed because Plaintiff had not received notice of the suspension before being charged with the offense. (Collins Aff. ¶ 9 and Collins Exhibit 2.)

[4] While the Plaintiff was in a crouched position coughing for the Officer during the strip search procedure, she expelled menstrual fluid, which caused her even greater humiliation and embarrassment. (Collins Aff. ¶ 26.) She was forced to clean up the blood herself with paper towels provided by the booking officers and take the paper towels to the Booking Desk itself and ask the male officer if she could dispose of them in his wastebasket. (Collins Aff. ¶¶ 28, 29.)

4

stall, which is located in front of and to the left of the Booking Desk.  (Collins Aff. ¶ 64.)  The Booking Room is a very busy area in the Knox County Jail. (Collins Aff. ¶ 65.)  The changing area of the shower stall is shielded from view by a plastic curtain, which does not extend completely from one side to the other.  (Collins Aff. ¶¶ 66-67.)

After being strip searched, Plaintiff changed into a two piece orange jail uniform and was placed in one of the detoxification rooms off the booking area.  (Collins Aff. ¶ 35; Mylen Aff. ¶ 9; Defendants' Exhibit 1.)  Plaintiff was then moved to cell # 127 by Officer Reed. (Collins Dep. at 46, 50-51; Defendants' Exhibit 3.)  Cell # 127 does not have a toilet.  (Collins Aff. ¶ 37.)  Cell # 127 sometimes houses men but sometimes houses women, but in either case it is normally monitored every 15 minutes by a member of the jail staff.  (Carver Aff. ¶ 8.)  Cell # 127 shares a dayroom with an adjacent cell.  (Collins Dep. at 49; Carver Aff. ¶ 5.)  A person who is housed in cell # 127 would have access to and the ability to have contact with the inmate in the adjacent cell.  (Carver Aff. ¶ 7.)  When Plaintiff was placed in cell #127, there was another female inmate in the adjacent cell and the doors between the cells and the dayroom were not locked.  (Collins Dep. at 49-50.)  The individual in the adjacent cell was a sentenced inmate.

Cell # 127 does not have a bathroom, but the adjacent cell does.  (Collins Dep. 51-52; Carver Aff. ¶ 6.)  While Plaintiff was in cell # 127, she needed to use the bathroom.  (Collins Dep. at 51.)  Plaintiff alleges that she was given a choice to use the hole in the floor, use the bathroom in the adjacent cell or pound on the door until someone came to take her to use another bathroom.  (Collins Dep. at 51-52, 54.)  Plaintiff chose to use the toilet in the adjacent cell. (Collins Dep. at 51-52, 55.)  Officer Reed stood in the doorway of the cell when Plaintiff entered the cell to use the toilet.  The toilet was on the other end of the cell from the doorway.  (Collins Dep. at 56.)  Officer Reed remained standing in the doorway of the cell, where he could see the

5

Plaintiff lower her pants, and when Plaintiff started using the toilet. (Collins Dep. at 55-57, 75-76.) At the suggestion of the other inmate in the cell, Officer Reed moved out of sight and did not observe Plaintiff use toilet tissue or pull up her pants when she was finished using the toilet. (Collins Dep. at 57-59.) After Plaintiff was finished using the toilet, Officer Reed came back in and put the Plaintiff in her cell, shut the door, locked the door and locked the door of the adjacent cell for the night. (Collins Dep. at 59-61; Defendants' Exhibit 2.)

The next morning Plaintiff was handcuffed and shackled and taken to Court with several other detainees. (Collins Aff. ¶¶ 46, 47.) During the trip to the courthouse and while she was at the courthouse, Plaintiff was guarded by two corrections officers. (Collins Aff. ¶ 48.) While at the courthouse, Plaintiff met privately with no one. (Collins Aff. ¶ 53.) Several hours later, after being arraigned and bail was set at $1,000.00 unsecured, Plaintiff returned to the Knox County Jail. (Collins Dep. at 62; Defendants' Exhibits 1 and 4.) Plaintiff was transported back to the Knox County Jail in the same manner as she was brought there – handcuffed, shackled and led in a line with several other arrestees guarded by two correctional officers. (Collins Aff. ¶ 56.)

Knox County Jail cannot release detainees until they receive and complete the paperwork authorizing the individual's release from the court. (Carver Aff. ¶ 9.) On some occasions that paperwork arrives with the detainee when they return from court, but, other times, the paperwork does not accompany the detainee. If the paperwork does not accompany the detainees on their return from court, the paperwork is brought to the Jail later that day. (Carver Aff. ¶ 10.) When Plaintiff returned from court she brought bail paperwork; however, the jail still had to complete its paperwork in order for Plaintiff to be released. (Collins Aff. ¶ 55; Defendants' Exhibit 2.) After she returned to the jail, she was strip searched by Officer Shannon Hilker. (Collins Aff. ¶¶ 57, 60.) During the second strip search, Plaintiff was once again required to run through the strip

6

search procedure she was previously subjected to, including the visual body cavity search procedures.  (Collins Aff. ¶¶ 61- 62.)  Plaintiff was then placed back in the same cell she spent the night in until the paperwork for her release was finished.  (Collins Dep. at 68.)  Plaintiff was released from the Knox County Jail at approximately 2:57 p.m. on January 17, 2006. (Defendants' Exhibits 2 and 4.)

The strip search was a horrifying experience for Plaintiff.  (Collins Aff. ¶ 33.)  At the time of the strip search, Plaintiff had her menstrual period and she felt "wicked embarrassed." (Collins Aff. ¶¶ 26, 32.)  Since being strip searched, Plaintiff has suffered extreme anxiety and still cannot stop thinking about it. (Collins Aff. ¶ 71.)  She has been under a physician's care, in counseling and taken medication as a result of this traumatic event.  (Collins Aff. ¶¶ 72-73.) Plaintiff continues to experience insomnia, nightmares, extreme anxiety, panic attacks, shortness of breath and depression.  (Collins Aff. ¶¶ 79-80.) The events of that night and the following day have also significantly affected Plaintiff's relationship with her husband.  (Collins Aff. ¶ 74.) They no longer sleep together or share a bathroom.  (Collins Aff. ¶¶ 75-76.)  Plaintiff no longer changes her clothes in his presence and they have not engaged in sexual activity since this event occurred.  (Collins Aff. ¶¶ 77, 78.)

Sheriff Daniel Davey was neither present for, nor participated in, any aspect of Ms. Collins incarceration at the Knox County Jail.  (Collins Response to Interrogatories ¶¶ 7, 18.) However, Sheriff Davey was ultimately the supervisor for the Knox County Jail for all periods of time relevant to this case.  Knox County Jail, like most jail facilities, has a problem with contraband.  (Carver Aff. ¶ 11.)  Defendant has designated Raymond J. Sabbatine as an expert in the field of security in correctional facilities.  (Defendants' Exhibits 6 and 7.)  Mr. Sabbatine opines that contraband is any single item or quantity of a controlled item that may pose a threat

to the broad jail population, including inmates, staff, visitors, and others, which poses a threat to the public or institutional safety, or which negatively impacts the delivery of services to inmates. (Defendants' Exhibit 7 at 1; Deposition of Raymond Sabbatine at 60.)   When an inmate is admitted to a correctional facility, through a process commonly referred to as "intake," there is a significant risk that contraband may be brought into the facility by an inmate.   (Affidavit of Raymond Sabbatine ¶ 3.)   The process of admitting a new inmate to a correctional facility requires a concerted effort to prevent the introduction of contraband into the facility.   (Sabbatine Aff. ¶ 4.)   Contraband includes items or combinations of items that have demonstrated a custodial threat by impacting the ability to protect the broad jail population, including instruments of assault, instruments of self-harm, escape instruments, barter contraband, drugs, firearms, and many other items such as pens, paper clips and chewing gum.   (Defendants' Exhibit 7 at 1; Sabbatine Dep. at 60-62.)   Contraband includes objects not normally associated with security risks, such as feminine hygiene pads, chewing gum, and pens.   Feminine hygiene pads can present a suicide risk or be used to smuggle contraband, chewing gum can be used to destroy jail locks which can allow an inmate to be barricaded, and pens can be used to hurt people. (Sabbatine Dep. at 62-65, 69, 70.)

## III.   Discussion

### A.   Municipal Liability – Knox County

Municipalities cannot be held liable under § 1983 based upon the theories of respondeat superior or vicarious liability. Monell v. Department of Social Servs., 436 U.S. 658, 694-95 (1978).  A municipality may be found liable under § 1983 only where

> [T]he action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.   Moreover ... local governments ... may be sued for

> constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not reached formal approval through the body's official decision-making channels.

Id. at 690-91.  Thus, an unconstitutional governmental policy may be inferred either from the official pronouncements and actions of a governmental agency, or from custom.  A single decision by a municipal official with final policy making authority may also create a municipal policy.  See Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986); see also Krulik v. Board of Educ. of New York, 781 F.2d 15, 23 (2d Cir. 1986) ("an individual official's acts can rise to the level of 'policy' when 'senior personnel' knowingly 'acquiesce' in their subordinates' behavior").

In Count I Plaintiff claims that at the time of her arrest, Knox County had an unconstitutional policy and/or custom and practice of conducting a strip search and visual body cavity search of every person taken into custody at the Knox County Jail.  Since Plaintiff cannot, as a matter of law, establish a constitutional violation on a theory of vicarious liability, she must be able to prove the existence of a governmental policy, custom or practice.  Although Plaintiff's Complaint alleges that an official strip search policy and/or custom were in effect on January 16, 2006, the factual record fails to provide any evidence of any strip search policy.  Plaintiff argues based on this Court's decision in the case of Dare v. Knox County, 02-251-P-C, that the doctrines of collateral estoppel and stare decisis bar relitigation of the issue of whether Knox County maintained an unconstitutional policy of strip searching arrestees.

In Dare, a case that was filed in this district and ultimately settled, the Court determined on summary judgment that between the period of November 20, 1996 through August 2002, Knox County maintained an unconstitutional policy of strip searching all misdemeanor detainees.  (See Order Granting in Part and Denying In Part Plaintiffs' Motion for Partial Summary Judgment (Docket No. 141); Order on Defendants' Motion for Reconsideration

9

(Docket No. 164).)  However, by its own terms, that decision does not extend into the January 2006 time period when Plaintiff was held at the Knox County Jail.[5]  Additionally, Plaintiff provides no evidence that strip searches of persons arrested and held at the Knox County Jail was a custom or practice of the Defendants in January 2006.[6]  The time frame covered in the Dare case ran through December 31, 2004.  Plaintiff relies on the particular facts of the instant case, which are insufficient to raise an inference of a municipal custom or policy.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  Because Plaintiff has failed to establish an affirmative link between any policy and the constitutional violation she alleges, the Court will grant Defendants' Motion for Summary Judgment on Count I of Plaintiff's Complaint.

In Count II, Plaintiff claims that Knox County had an unconstitutional policy and/or custom and practice of conducting a strip search and visual body cavity search of every person who returns from Court after having bail set.  There is no evidence in the record that Defendant maintains a policy that the Knox County Jail shall conducting a strip search and visual body cavity search of every person who returns from court after having bail set.  This claim also rests on Plaintiff's ability to prove the existence of a governmental custom or practice.  Plaintiff provides no evidence that conducting a strip search and visual body cavity search of every person who returns from court after having bail set was the practice or custom of the Knox County Jail.  Plaintiff simply alleges the particular facts of his case, which, as stated above, are

---

[5] Indeed, Plaintiff's counsel in Dare moved to enlarge the class period through May 1, 2006.  The Court denied that motion.  (See Dare v. Knox County, 02-251-P-C, Order Denying Plaintiffs' Motion to Extend Class Period (Docket No. 165).)

[6] Defendants include in the summary judgment record 39 Incident Reports of contraband found at the Knox County Jail between August 2002 to March 2008.  Without any evidence that the incidents of inmates attempting to or having brought contraband into the Knox County Jail lead to the development of a policy or custom of strip searching inmates, the Incident reports are irrelevant to the Court's analysis in this case.

insufficient to raise an inference of a municipal custom or policy.  See id.  Accordingly, the Court will grant Defendants' Motion for Summary Judgment on Count II of Plaintiff's Complaint.

### B.  Sheriff Daniel Davey

In Count III Plaintiff contends that Knox County Sheriff Daniel Davey is liable for implementing and maintaining a policy and practice of conducting strip searches and visual body cavity searches of all persons admitted to the Knox County Jail.

Plaintiffs have sued Sheriff Davey in both his official capacity and his personal capacity. Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell, 436 U.S. at 690 n. 55).  Thus, the Court will treat Plaintiff's suit against Sheriff Davey in his official capacity as an action against Knox County.  Discussed supra.  When a plaintiff asserts claims against an individual in his supervisory capacity, liability cannot be established on a basis of respondeat superior.  Rather, "[a] supervisor may be found liable only on the basis of his own acts or omissions.  Moreover, a supervisor cannot be liable for merely negligent acts.  A supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others."  Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994) (internal citations omitted).  Unlike individual officer liability, the liability of supervisory officials does not depend on their personal participation in the acts of their subordinates which immediately brought about the violation of the plaintiff's constitutional rights.  See Voutour v. Vitale, 761 F.2d 812, 819 (1st Cir. 1985).  Liability could result from Sheriff Davey's acquiescence to Knox County Jail's ongoing practice of unconstitutionally strip searching detainees admitted to the Knox County Jail.  See Jett v. Dallas Independent School Dist., 491

11

U.S. 701, 737 (1989) (A municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's "acquiescence in a long standing practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.").

The evidentiary record establishes that Sheriff Davey was neither present for, nor participated in, any aspect of Ms. Collins incarceration at the Knox County Jail.  Moreover, nothing in the record indicates that there was an unconstitutional policy, custom or practice of strip searching at the Knox County Jail in January 2006.  Therefore, there is nothing in the record to establish that in or around January 2006 Sheriff Davey acquiesced to a policy or practice of unconstitutional strip searches at the Knox County Jail.  Accordingly, the Court will grant Summary Judgment on Count III of Plaintiff's Complaint.

### C.  Individual Corrections Officers

Defendants move for summary judgment on the basis that all of the individual corrections officers are entitled to qualified immunity.  "Qualified immunity 'provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties.'"  Borges Colon v. Roman-Abreu, 438 F.3d 1, 18 (1st Cir. 2006) (quoting Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005)).  The Court applies a three-part test to determine whether a public official is entitled to qualified immunity, asking "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue."  Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004).  Qualified immunity is an affirmative defense against damages liability which may be raised by state officials sued in their personal capacity.  See Gomez v. Toledo, 446 U.S.

635 (1980).  The general rule of qualified immunity, set out in <u>Harlow v. Fitzgerald</u>, 457 U.S.

800, 818 (1982), is that "government officials performing discretionary functions, generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

This rule eliminates from consideration claims of the officials' subjective state of mind, such as

bad faith or malicious intention, concentrating on the "objective reasonableness" of the official's

conduct.  The Court will consider the issue of qualified immunity as to each of the three

individual corrections officers, which Plaintiff has brought claims against in this case.

### 1.  Officer Helen Mylen

After Plaintiff notified jail officials that she would not be able to post bail, Sergeant

Marsha Clark, the supervisor on duty that night, determined from Plaintiff's Knox County Jail

inmate file that she had previously been charged with a drug offense.  However, Officer Helen

Mylen pointed out to the intake officer that the computer indicated that the charges had been

dismissed.  (Collins Aff. ¶ 21.)  Nevertheless, based on the prior charge and the fact that the

Plaintiff was unable to make bail, Sgt. Clark told Officer Mylen to conduct a strip search of

Plaintiff.

The strip search took place in the shower stall changing area, which is located

immediately in front of and to the left of the Booking Desk.  As part of the strip search, Ms.

Collins was required to "run her fingers through her hair; extend her arms out straight; open her

mouth for visual inspection; spread her toes; lift each of her breasts; squat on her haunches with

her back to the Corrections Officer; and while squatting, cough violently several times."  (Collins

Aff. ¶ 25.)  Plaintiff was also required to turn and face Officer Mylen and expose her vagina.

(Collins Aff. ¶ 27.)  During the strip search procedure, Plaintiff saw a male guard walk over to

13

the strip search area and hand Officer Mylen a new tampon to give to the Plaintiff.  (Collins Aff. ¶ 34.)

### a.  No Constitutional Right Was Violated

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  In this case that is, whether Ms. Collins constitutional rights were violated by Officer Mylen when she was strip searched after being admitted to the Knox County Jail.  The Court concludes that on the facts of this case Plaintiff's constitutional rights were not violated.

In determining the constitutionality of the search at issue, the court must be mindful not only of the status of the Defendants in this case, but also the status of the Plaintiff.  Plaintiff has challenged the searches that were performed on her while she was a detainee at the Knox County Jail.  Determining whether there is a constitutional violation of the rights of someone confined in a jail, even as a pre-trial detainee, is different from determining whether the rights of an unincarcerated individual have been violated.  Bell v. Wolfish, 441 U.S. 520, 546 (1979).  Pre-trial detainees do not forfeit all of their constitutional rights at the jailhouse door.  Id. at 545. Nevertheless, pre-trial detainees "simply do[] not possess the full range of freedoms of an unincarcerated individual."  Id. at 546.  Rather, a detainee's rights must be balanced against "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution." Id.  The court's function in this type of case is to seek a "mutual accommodation" between the detainee's rights and the restrictions of jail.  Id.  All restrictions on inmate rights "must be evaluated in light of the central objective of prison administration, safeguarding institutional security."  Id. at 547.  In general, the law gives wide-ranging deference to prison officials'

14

decisions concerning the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain security.  Id.  The law regarding strip searches requires balancing.

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Id. at 559 (citing United States v. Ramsey, 431 U.S. 606, (1977)); United States v. Martinez-Fuerte, 428 U.S. 543 (1976); United States v. Brignoni-Ponce, 422 U.S. 873 (1975); Terry v. Ohio, 392 U.S. 1 (1968); Katz v. United States, 389 U.S. 347 (1967); Schmerber v. California, 384 U.S. 757 (1966).  In balancing these competing interests in this case, the Court will consider the justification for, scope, manner, and place of the search in question.

### i.  Justification for the Search

Here, the correction officer's decision to strip search Ms. Collins was based on the drug charge in her inmate file,[7] the fact that she was self-surrendering on an outstanding felony arrest warrant and that she was going to be housed overnight at the jail, which, like most jail facilities, has a problem with contraband.  (Carver Aff. ¶ 11.)  Because Plaintiff self-surrendered, her situation was distinguishable from a traditional arrest in the field where the individual is,

---

[7] In this case, the Court does not find it necessary to analyze what in an arrestee's criminal history can serve as a basis for reasonable suspicion.  The Court considers Sgt. Clark's reliance on Ms. Collins's internal inmate file somewhat problematic.  Specifically, it is unclear on this record what, if any, other criminal history information may have been available to the officers at that time regarding the disposition of Plaintiff's drug charge, which was almost two years old.  Although relying on a pending drug charge from two months ago documented in an internal inmate file may support reasonable suspicion that a person is secreting contraband, the same inference is not necessarily raised from a two year old drug charge found in the inmate file, which did not track the disposition of the criminal charges.  That is because, presumably, the two year old charge has resulted in a conviction, an acquittal or a dismissal of the charge, whereas, it is unlikely, that the two month old charge has resulted in any final disposition.

presumably, making an unexpected visit to the jail.   The Court finds that there are legitimate security concerns related to the introduction of contraband, which justified strip searching Ms. Collins after she notified jail officials that she was unable to make bail.   Specifically, the reasonable justification develops from the fact that Ms. Collins self-surrendered to the Knox County Jail from the community.   Under these circumstances, Plaintiff's entrance into the jail was planned and, therefore, she had the time and the opportunity to secure and hide contraband on her person.

### ii.  Scope of the Search

The scope of the search performed by Officer Mylen was reasonable as well.  During the strip search, Ms. Collins was required to take all of her clothing off; run her fingers through her hair; extend her arms out straight; open her mouth for visual inspection; spread her toes; lift each of her breasts; squat on her haunches with her back to Officer Mylen; and while squatting, cough violently several times.  (Collins Aff. ¶ 25.)  Plaintiff was also required to turn and face the Officer Mylen and expose her vagina.  (Collins Aff. ¶ 27.)  The scope of this search was extensive and clearly offensive to Ms. Collins.  However, given Ms. Collins potentially planned admission, which provides the opportunity to secret contraband on or in the body, the Court finds the scope of the search reasonable.

### iii.  Manner of the Search

The search at issue was conducted by Officer Mylen in a reasonable in manner.  The search was performed by an officer of the same sex as Ms. Collins.  There is no allegation that Plaintiff was subjected to anything beyond a visual examination; nothing suggests Plaintiff was touched by Officer Mylen as part of the search.  While the Plaintiff was in a crouched position coughing for the Officer during the strip search procedure, she expelled menstrual fluid, which

16

caused her even greater humiliation and embarrassment.  (Collins Aff. ¶ 26.)  Ms. Collins maintains that she was forced to clean up the blood with paper towels provided by the booking officers and then dispose of them in the wastebasket at the Booking Desk.  (Collins Aff. ¶¶ 28, 29.)  The Court is mindful that Ms. Collins was embarrassed and humiliated by the process and her embarrassment was compounded because she had her menstrual period at the time of the strip search.  Without discounting or minimizing Ms. Collins' understandable and genuine emotional reaction, that reaction does not determine the constitutionality of the search. Ultimately, the Court does not believe that the visual body cavity search that cause the discharge of bodily fluid was performed in an unreasonable manner.

### iv.  Place of the Search

This strip search took place in the shower stall changing area, which is immediately in front of and to the left of the busy Booking Room.  (Collins Aff. ¶¶ 64-65.)  The record indicates that the changing area of the shower stall is shielded from view by a plastic curtain, which does not extend completely from one side to the other.  (Collins Aff. ¶¶ 66-67.)  The record contains no additional detail for, or visual depiction of, the configuration of the Booking Room and the area where Ms. Collins' strip search took place.  Therefore, viewing the facts in the light most favorable to Plaintiff, the Court will assume that the shower curtain, which does not extend completely from one side of the opening to the other, is the only barrier that provides a viewing screen from the Booking Room.

Plaintiff seems to be challenging the reasonableness of the place where the search was performed because, during the strip search procedure, Ms. Collins states that she saw a male guard walk over to the strip search area and hand Officer Mylen a tampon.  (Collins Aff. ¶ 34.) The inference Plaintiff apparently would like the Court to make is that because Plaintiff was able

to see a male guard, the male guard was able to see her.  On this record, the potential visual accessibility of the shower stall changing area, where the strip search was conducted, seems problematical.  The ability of persons in the booking area to obtain glimpses of individuals being strip searched through the edges of the shower curtain certainly produces/creates an environment that is less than private to conduct strip searches.  However, even if the male officer was able to glimpse at Plaintiff through the edges of the shower curtain, the record does not indicate that Plaintiff was unclothed when the male officer came within view of the shower stall changing area.  Moreover, even if the male officer had accidently seen her unclothed as he walked up to or past the curtain, the Court of Appeals for the First Circuit has held that the "inadvertent, occasional, casual and/or restricted observation of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment."  Cookish v. Powell, 945 F.2d 441, 447 (1st Cir. 1991).  In the absence of any clear evidence in the record that the place where the search was carried out is open for viewing from the adjacent Booking Room or that anyone observed the search other than the officer who administered it, the Court finds that the shower stall changing area was a reasonable place to perform Ms. Collins' strip search.

On these facts, because the balance of the interests under the Fourth Amendment weighs in favor of the officer conducting the search and there was nothing unreasonable about the manner, scope or place of the strip search, the Court will grant qualified immunity to Officer Mylen.

### 2. Officer Shannon Hilker

The record establishes that Officer Shannon Hilker conducted the second strip search of Plaintiff after she returned from court and was in the process of getting released on bail.  During this second strip search, Plaintiff was required to perform the same behaviors she had during the

18

earlier strip search; she ran her fingers through her hair, extended her arms out straight, opened her mouth for visual inspection, spread her toes, lifted each of her breasts, squatted on her haunches with her back to the Corrections Officer and while squatting, Plaintiff was required to cough violently several times.  Plaintiff was again required to turn and face the Corrections Officer and expose her vagina.  Plaintiff was then placed back in the same cell she spent the night in until the documents authorizing her release were finished.  Plaintiff was released from the Knox County Jail approximately one hour after returning from court.

### a.  No Constitutional Right Was Violated

Plaintiff contends that she was unlawfully strip searched when she returned to the jail from court after bail has been granted bail.  Here again, the Court will look to the scope, manner, justification, and place of the search when assessing the reasonableness of the strip search under the Fourth Amendment.

### i.  Justification for the search

Ms. Collins was strip searched after being transported to the Knox County Courthouse for arraignment and then returned to the Knox County Jail.  Defendants assert that the strip search performed by Officer Hilker was constitutional because Plaintiff had been taken out of the jail to court where she had an opportunity to come into contact with people while outside of the jail and could possibly acquire contraband.  Defendants specifically analogize this situation to a post-contact visit strip search.  Both the Supreme Court and the First Circuit have previously found strip searches conducted in a reasonable manner after presumably supervised contact visits are constitutional.  See Bell, 441 U.S. at 558-60 (1979); Wood v. Hancock County Sheriff's Dept., 354 F.3d 57, 67-70 (1st Cir. 2003).  Bell teaches that the widely acknowledged risks posed by contact visits provide sufficient suspicion to justify a blanket policy.  Bell, 441 U.S. at 558-60.

19

Guided by Bell, other courts evaluating the constitutionality of strip searches, have remarked on the distinctive need to search that arises from contact visits.  See, e.g., Roberts v. Rhode Island, 239 F.3d 107, 111 (1st Cir. 2001) ("Courts have given prisons far more leeway in conducting searches of inmates with outside contact than in searching everyone, simply because such visits often allow smuggling of contraband."); Arruda v. Fair, 710 F.2d 886 (1st Cir. 1983) (suggested that an individualized reasonable suspicion is not necessary to search certain groups of inmates, such as those who receive visitors); see also Goff v. Nix, 803 F.2d 358, 370-71 (8th Cir.1986) (Visual body cavity search of segregation unit inmates before and after going to exercise area to prevent passage of contraband held to be constitutional.); Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988) ("Visual body cavity searches conducted after contact visits as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court."); Johannes v. Alameda County Sheriff Dept., 2008 WL 740305 (9th Cir. 2008) (court found the jail's policy providing for visual strip searches of "inmates who have been … outside the secured facility … upon return to the facility or housing unit" to be constitutional); Masters v. Crouch, 872 F.2d 1248, 1253 (6th Cir. 1989) (citing the "obvious risk" that visits may be used to introduce contraband).

Although while at the courthouse Plaintiff met privately with no one, she certainly had contact with individuals other than corrections officers and, thus, she had the opportunity to obtain and secret contraband.  Moreover, there was still a basis for detention of Plaintiff at the time she was searched – the paperwork necessary for her release was not completed and she was being placed back in the cell where she had spent the previous night.[8]  Given the necessity of returning Ms. Collins into a cell at the jail, it was reasonable for Officer Hilker to perform the strip

---

[8] In this cell, Plaintiff could have contact with other inmates in the adjoining cell as well as inmates in the dayroom.

search.[9]  This situation creates a reasonable security concern for the Knox County Jail and, thus, justifies the strip search that Officer Hilker performed before placing Ms. Collins back in the cell.

### ii. Scope of the Search

Like the first search, the scope of this strip search was reasonable.  The scope of this second search was extensive and clearly offensive, but given the fact that Ms. Collins left the control of the Knox County Jail officers and came in contact with individuals and potential contraband at the courthouse, the Court finds that the scope of the strip search was reasonable to protect the internal order and maintain security at the Knox County Jail.

### iii. Manner of the Search

The search at issue was also conducted in a reasonable in manner.  The search was performed by a female corrections officer – the same sex as the inmate.  As discussed previously, the Court is aware that Ms. Collins was humiliated by the process and this type of emotional reaction is understandable, nevertheless, this reaction to the search does not make the search unconstitutional.

### iv. Place of the Search

As with the first strip search performed on Ms. Collins, this search took place in the shower stall changing area, which is immediately in front of and to the left of the Booking Desk. (Collins Aff. ¶ 64.)  Plaintiff does not claim that this search was conducted in anything less than a private setting.

---

[9]The Court notes that a better practice may be for the Knox County Jail to develop a system whereby individuals, who are to be released after the jail's paperwork is completed, are not placed back in a jail cell or general population.  However, on the current record, the Court cannot determine how feasible it would be to designate an area outside the cells holding the general jail population to detain individuals who are returned from court and ready to be released while their paperwork is completed.

Accordingly, the balance of the interests under the Fourth Amendment weighs in favor of the officer conducting the search.  Therefore, the Court will grant qualified immunity to Officer Hilker.

### 3.  Officer Reed

Although the Complaint asserts that Officer Reed conducted an unlawful strip search, Plaintiff offers no analytical argumentation on summary judgment to support her claim against Officer Reed.  Nevertheless, the Court assumes that Plaintiff's claim against Officer Reed is based on her allegations that Officer Reed – a male corrections officer – could see the Plaintiff lower her jail pants to use the toilet on the night of January 16.  Viewed in the light most favorable to Plaintiff, the record establishes that Officer Reed did not observe her use toilet tissue or pull up her jail pants and that Officer Reed moved away from the area where he could view Plaintiff after she was sitting on the toilet.

### a.  No Constitutional Right Was Violated

Plaintiff's Complaint alleges that Officer Reed violated her right of privacy by watching her go to the bathroom.  (Complaint ¶ 35.)  Defendants contend that Ms. Collins' right to privacy was not violated by Officer Reed's conduct.  Specifically, Defendant relies on Cookish v. Powell, 945 F.2d 441 (1st Cir. 1991), which addressed the issue of a female viewing a male strip search during or right after an emergency.  In Cookish the court held that officials at the prison were entitled to qualified immunity because it was not clearly established what constituted an emergency.  Id. at 448 n.10.  Speaking to the constitutional issue, the court announced that the relevant law in 1987 was that "inadvertent, occasional, casual and/or restricted observation of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment." Id. at 447; see also Mitchenfelder, 860 F.2d at 334 (held that infrequent and causal observation, or

observation at a distance by guards of the opposite sex is constitutional).   Indeed, other circuit courts have extended this rule to more than just the occasional or inadvertent observation.  See Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990) (court held visual surveillance of male inmates by female guards did not violate the inmates' right to privacy and stated "[w]hatever minimal intrusions on an inmate's privacy may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concern for safety and equal employment opportunities"); Oliver v. Scott, 276 F.3d 736 (5th Cir. 2002) (court held that permitting female guards to monitor male inmates in bathrooms and showers was not unconstitutional); Johnson v. Phelan, 69 F.3d 144, 145 (7th Cir. 1995) (court found no constitutional violation where male prisoner brought suit alleging that female guards at a jail are "assigned to monitor male prisoners' movements and [could] see men naked in their cells, the shower, and the toilet.").

In this case, Defendant Reed's conduct did not violate Plaintiff's Fourth Amendment rights.  According to Plaintiff, when Plaintiff asked to go to the bathroom, Defendant Reed gave the choice of using the hole in her cell floor, pounding on the door for someone to bring her to a bathroom or going in the adjacent cell.  Plaintiff chose to use the toilet in the adjacent cell.  She alleges that Officer Reed stood in the doorway of the cell while she pulled her pants down and began to use the toilet.  The toilet was located at the opposite end of the cell from where Officer Reed stood in the corridor.[10]  Defendant Reed then moved farther away outside of another door near the common area and Plaintiff admits that Officer Reed did not linger while she used toilet paper or pulled up her pants.  Therefore, this interaction was for a relatively brief period of time

---

[10] Here again, the record is devoid of any evidence regarding configuration of the cell or the distance from where Defendant Reed stood to the toilet in the cell.

and Defendant Reed was at some distance from Plaintiff.  Plaintiff also had the top of her jail uniform on at all times.  Once Plaintiff was finished using the bathroom, Officer Reed placed Plaintiff in her cell and locked the door to both Plaintiff's cell and the adjacent cell.  Plaintiff does not allege that Defendant Reed or any other officers watched her go to the bathroom on any other occasions.  This limited interaction did not result in a violation of Plaintiff's Fourth Amendment rights.

Accordingly, the Court will grant qualified immunity to Officer Reed.

**IV. Conclusion**

It is ORDERED that Defendants Knox County, Helen Mylen, Shannon Hilker, and Officer Reed's Motion for Summary Judgment (Docket # 27) and Defendant Sheriff Daniel Davey's Motion for Summary Judgment (Docket # 30) be, and they are hereby, GRANTED.

/s/ George Z. Singal_____
Chief United States District Judge

Dated this 1st day of August, 2008.